| | |
|---|---|
| TAREEM JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | )     **CAUSE NO. 1:10-CV-142** |
| v. | ) |
| | ) |
| ITT CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

## I.  INTRODUCTION

Plaintiff Tareem Johnson is suing his former employer, Defendant ITT Corporation, alleging that his race led to discrimination and ultimately his termination.  He also claims he was the victim of retaliation, protected under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2, *et seq.*, ("Title VII"),[1] and that ITT intentionally inflicted emotional distress on him.  On May 16, 2011, ITT moved for summary judgment on all of Johnson's claims.  (Docket # 20.)  Johnson has not filed a response.  Nevertheless, and although the Court could rule on the motion summarily, Local Rule 7.1 (a), Johnson's claim received a thorough review.  After reviewing the record, the Court has determined that, for the following reasons, ITT's motion for summary judgment will be GRANTED.

---

[1] Accordingly, subject matter jurisdiction arises under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (Docket # 15.)

## II.  FACTUAL AND PROCEDURAL BACKGROUND[2]

On December 17, 2007, ITT hired Johnson as a Supervisor Operations II in its

Communication Systems division to install radios in Iraq.  (Compl. ¶¶ 11-13; Beeson Aff. ¶ 6.)

ITT Communication Systems is distinct from and has different management than ITT Systems.

(Claudy Dep. 11-12; *see* Beeson ¶¶ 1-5, 12.)   In March 2008, Johnson began his first assignment

with ITT Communication Systems in Camp Taji, Iraq.  (Compl. ¶ 14; Johnson Dep. 18-19.)  After

the expiration of the contract under which they were working, Johnson returned to the United

States with fellow team members Melvin Pilapil, David Kneeland, Mike Landum, and Thomas

Garner.  (Johnson Dep. 32-34, 38-39.)  Team members Lew Blackwood and Kris Wohlfort

remained in Iraq.  (Johnson Dep. 32-33.)

Upon Johnson's return from Iraq in October 2008, Johnson reported to Cyril Claudy, Field

Services Manager in the Communication division.  (Compl. ¶¶ 22, 24; Claudy Dep. 8.)  Claudy

allegedly introduced himself to the entire team, which was racially diverse (Caucasian, African-

American, Filipino, and Hispanic), as a "prick."  (Johnson Dep. 115-16.)  Claudy then met with

each member of Johnson's team individually to determine whether they wished to stay with ITT

and to inform them of the open positions.[3]  (Claudy Dep. 32.)  These meetings were brief,

---

[2]Johnson failed to submit a factual statement called for by Local Rule 56.1(a) and has therefore, under Local Rule 56.1(b), conceded to ITT's version of the facts as set forth in its brief supporting summary judgment. (*See* Def.'s Br. in Supp. of Mot. for Summ. J. 1-13); *Yancick v. Hanna Steel Corp.*, No. 10-1368, 2011 WL 3319568, at *11 (7th Cir. Aug. 3, 2011); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994); *see also Wackett v. City of Beaver Dam*, 642 F.3d 578, 582 n.1 (7th Cir. 2011) (noting that the district court properly deemed as admitted defendants' proposed factual findings, which plaintiff did not contest, under the Eastern District of Wisconsin's Local Rule 56.2(e)).  Nevertheless, in determining whether summary judgment is proper, the Court still views ITT's statement of material facts in the light most favorable to Johnson.  *Yancick*, 2011 WL 3319568, at *11.

[3]Typically, Claudy meets with each returning employee upon the conclusion of an overseas contract to determine if the employee can be placed on another contract.  (Hughley Dep. 74, 77.)  ITT does not consider this process an interview.  (Hughley Dep. 147; Claudy Dep. 32.)  ITT follows this process because, without a contract, it does not have a basis for paying the employee, potentially necessitating layoff.  (Hughley Dep. 78.)  Johnson asserted in his deposition, however, that he was the only member of his Iraq team that Claudy "re-interviewed."

informal, and without the involvement of Human Resources.  (Hughley Dep. 147; Claudy Dep. 34.)  In the meeting with Johnson, Claudy and Johnson discussed various topics, including whether Johnson wanted to stay with ITT, the job description for a field service representative, and their families.  (Johnson Dep. 37; Claudy Dep. 32.)  According to Johnson, Claudy was "pretty professional" throughout the meeting (Johnson Dep. 37:8), and Johnson was happy with Claudy's decision to make him a field service representative (Johnson Dep. 40).

After two assignments to military bases in Georgia, Johnson was assigned to Fort Campbell.  (Johnson Dep. 40, 43.)  At Fort Campbell, Johnson worked at the RESET (radio repair) site, which Johnson stated operated from 7:00 a.m. to 5:30 or 5:45 p.m.[4]  (Johnson Dep. 56, 59.) Johnson worked as a Lead employee with Jorge Medina (Johnson Dep. 56-57), whom he was shadowing to learn how a RESET site operated (Claudy Dep. 72).  Johnson and Medina were the only two ITT Communication employees at the RESET site in Fort Campbell.  (Johnson Dep. 141.)  Johnson and Medina reported to Claudy, while ITT Systems employees at the same site reported to a different ITT Systems Manager.  (Johnson Dep. 141.)

At Fort Campbell, ITT worked together with Tobyhanna, a separate entity, to perform their contractual obligations to their shared customer, CECOM.  (Claudy Dep. 61.)  Tobyhanna employee Mark Avery was the Site Lead for Tobyhanna at Fort Campbell.  (Claudy Dep. 61.) Johnson had problems with Avery, and Johnson shared his complaints about Avery with ITT. (Johnson Dep. 88.)  Because Avery worked for Tobyhanna, ITT had no authority or supervision over him.  (Claudy Dep. 90-91.)  At one point, ITT sent supervisor Dave Rees to Fort Campbell to

_____

(Johnson Dep. 37.)

[4]Exhibit 7 to Claudy's Deposition indicates that the site was open from 6:00 a.m. to approximately 5:00 p.m.  (Claudy Dep. Ex. 7.)

observe and assist in dealing with Avery. (Johnson Dep. 165.) According to Johnson, Rees's presence temporarily improved Avery's behavior. (Johnson Dep. 165.) Johnson was not the only ITT employee to complain about Avery; according to Claudy, everybody complained about Avery. (Claudy Dep. 62, 90.) Johnson similarly agreed that people of all different backgrounds, including Caucasians and African-Americans, complained about Avery. (Johnson Dep. 86.)

In Spring 2009, Claudy learned that an installer position might need to be filled in Camp Taji, Iraq. (Claudy Dep. 57.) Based upon the needs of the operation, Claudy sent supervisor Rees to fill the position because of his experience and depth of knowledge. (Claudy Dep. 59.) Shortly thereafter, Claudy believed that Camp Taji might need another installer so he sent an email to see if anyone was interested. (Claudy Dep. 58.) Johnson wanted to return to Iraq[5] (Johnson Dep. 46) and expressed interest in that position (Claudy Dep. 58). However, the need for a second installer at Camp Taji operation did not ultimately materialize. (Claudy Dep. 58.)

On Saturday, June 6, 2009, Claudy received an early morning phone call from the CECOM Site Lead, stating that Johnson did not show up to the work site. (Johnson Dep. 76; Claudy Dep. 64-65.) Claudy was angry that he received a customer complaint about Johnson's absence and conveyed his frustration to Johnson during a phone call that same day. (Claudy Dep. 67; Johnson Dep. 75, 164.) Johnson testified that he could tell Claudy was upset and that he was a "little loud spoken" and "talking louder than usual," but not yelling. (Johnson Dep. 164:4-8.) During this call, Claudy informed Johnson of the gravity of his mistake and that it would cost him any potential deployment to Iraq. (Claudy Dep. 67.) Johnson defended his absence by contending he

---

[5]Initially, Johnson alleged that Claudy deployed everyone on Johnson's previous team except him. (Johnson Dep. 46.) However, Johnson later admitted that Lew Blackwood and Kris Wohlfort were his superiors and that he was "not even sure" when Pilapil, Kneeland, or Landum returned to Iraq. (Johnson Dep. 47.)

told the CECOM Site Lead (the same customer that complained to Claudy) that he was not going to be at the work site that day. (Johnson Dep. 74.) Johnson, however, did not inform Claudy or any other ITT Communication supervisor of any planned absence. (Johnson Dep. 76; Claudy Dep. 91-92.) While Johnson maintains that working on Saturday is optional (Compl. ¶ 44), ITT's policy is that, if the work site is open, ITT employees are expected to be there unless they have notified Claudy or an ITT supervisor of their absence (Claudy Dep. 63-64).

After his absence, Johnson contacted Human Resources Manager for the Communication Division, Chuck Hughley, an African American, who instructed Johnson to send him an email explaining "everything that was going on" at Fort Campbell with "the exact details." (Hughley Dep. 73; Beeson ¶ 9; Johnson Dep. 78, 162.) On June 12, 2009, Johnson wrote the email that Johnson now refers to as his "complaint" and the basis for his retaliation claim. (Johnson Dep. 78-79.) Johnson testified that his email included all of his complaints while working at Fort Campbell and that the email was triggered by his June 6, 2009, absence. (Johnson Dep. 72-73.) The email did not mention discrimination, harassment, or retaliation by ITT and is devoid of anything related to race or any other protected characteristic. (Johnson Dep. 71, Ex. 24.) Johnson did not make a complaint of race harassment or discrimination to Hughley. (Hughley Dep. 152.) Following the email, Johnson testified that Claudy interacted with him "as if nothing was wrong," but that he "could feel the animosity even though [Claudy] wasn't showing it."[6] (Johnson Dep. 114:9-12.) Notably, Hughley never received complaints of discrimination, harassment, or retaliation from other ITT employees in regard to Claudy. (Hughley Dep. 147-48.)

---

[6]Earlier in his deposition, Johnson testified that after he made this complaint, things with Claudy started to get a "little harsh, like he was targeting me." (Johnson Dep. 45.)

In early July 2009, Claudy received information suggesting that Jorge Medina, the Site Lead at Fort Campbell, was falsely recording his time. (Claudy Dep. Ex. 5.) Upon traveling to Fort Campbell to investigate (Claudy Dep. 71-72), Claudy and supervisor Doug Tellas observed when Medina (and Johnson) arrived at and left the work site on July 8, 2009 (Claudy Dep. 76, 78-79, Exs. 6, 7). On that day, Medina reported that he worked twelve hours despite only being at the work site for approximately ten hours. (Claudy Dep. 76, Exs. 5, 6, and 7.) Medina was immediately removed from his position (Claudy Dep. 94), and Johnson temporarily stepped in as the lead for the site (Claudy Dep. 73). Following an investigation, Medina was terminated for falsifying his timecards. (Claudy Dep. 94.)

Like Medina, Johnson's timecard for July 8, 2009, reported that he worked twelve hours that day. (Hughley Dep. 96, Ex. I.) According to Claudy's observations, however, Johnson left at 5:10 p.m.[7] (Claudy Dep. 76, Ex. 7.) Consequently, Johnson was removed from the work site and instructed to report to ITT offices in Fort Wayne to meet with Hughley and Claudy, where Johnson insisted that he worked the full twelve hours reported on his timecard.[8] (Claudy Dep. 81.) In this meeting, Johnson also stated that one reason for the discrepancy in his timecard was that he would stay over with Medina to train and do his reports, which contradicted Medina's statement. (Hughley Dep. 150-51, Ex. I.) Moreover, when deposed, Johnson continued to maintain that he worked from his home that evening by possibly using his VPN remote computer access to send emails, participate in security training on his ITT computer, and do reports. (Johnson Dep. 118-23.) ITT's computer system, however, does not show that Johnson did training on July 8,

---

[7]Johnson testified that he left at around 5:30 or 5:45 p.m. (Johnson Dep. 118.) Regardless of his departure time, as he arrived for work at approximately 7:15 a.m. (*see* Claudy Dep. Ex. 7), Johnson, by his own admission, worked no more than 10 ½ hours at the work site on July 8, 2009.

[8]Pursuant to ITT policy, anything over eight hours is considered overtime. (Claudy Dep. 96.)

2009.  (Beeson Aff. ¶ 13, Ex. A.)  ITT also has no record of Johnson's VPN remote access use on that day either.  (Hughley Dep. 99-101.)

On August 11, 2009, Hughley made the decision to terminate Johnson for violating an ITT policy concerning falsification or misrepresentation of company documents.  (Hughley Dep. 121, 151, Ex. J.)  Johnson maintains that ITT made a mistake when it terminated his employment because he contends that he worked after 5:00 p.m. and, therefore, did not falsify his timecard.[9]  (Johnson Dep. 123.)

Following the terminations of Johnson and Medina, ITT instituted a process that required employees to "sign in" their arrival and departure times at the work site.  (Claudy Dep. 95.)  The sign-in sheet differed from the timecard in that the timecard was submitted to ITT for payment of wages (Beeson Aff. ¶ 14), while the sign-in sheet was simply a spot-check tool (Claudy Dep. 95).  During a spot check comparing the employee sign-in sheets with their actual timecards, ITT discovered that Joseph Gray's sign-in sheet did not match his timecard.  (Claudy Dep. 95.)  While Gray was working less than eight hours per day, he wrote down eight hours on his sign-in sheet.  (Claudy Dep. 97.)  After investigating, ITT discovered that its customer (CECOM) had instructed Gray to write down eight hours on his sign-in sheet because ITT charged CECOM eight hours per day regardless of how long the ITT employee worked.  (Claudy Dep. 96-98.)  Gray never wrote down *more* than eight hours so the customer was never charged overtime for Gray's work (Claudy Dep. 97), and he never submitted a falsified timecard (Claudy Dep. 98).  When confronted, Gray readily admitted to the discrepancy and was forthcoming and remorseful about his actions.

---

[9]At the same time, Johnson admitted that he did not always accurately report his time (Johnson Dep. 135) and that he knew it was wrong to indicate he had worked overtime when he did not do so (Johnson Dep. 30).

(Beeson Aff. ¶ 15.)  Upon investigating, Jim Beeson, Human Resources Director, determined that Gray would be disciplined, but not terminated.  (Beeson Aff. ¶ 15.)

Upon his termination, Johnson brought suit against ITT, alleging racial discrimination in violation of Title VII, 42 U.S.C. § 1981, and Indiana's civil rights law, racial harassment in violation of Title VII, retaliation in violation of Title VII, and intentional infliction of emotional distress under Indiana state law.  In response to Johnson's various claims, ITT argues that Johnson cannot establish a *prima facie* case of race discrimination or of retaliation under the direct or indirect method used in an analysis of employment discrimination claims.  Furthermore, ITT contends that, even if Johnson could establish a *prima facie* case of race discrimination or retaliation, ITT has articulated a legitimate non-discriminatory or non-retaliatory reason for its decisions wholly devoid of pretext.  As for Johnson's racial harassment claim, ITT argues that Johnson cannot establish a *prima facie* case for that claim either.  Lastly, ITT maintains that Johnson's intentional infliction of emotional distress claim is plainly insufficient.

### III.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."  *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Waldridge,* 24 F.3d at 920.  If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted.  *Payne*, 337 F.3d at 770.  A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide

which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## IV. DISCUSSION

### A. *Race Discrimination*[10]

Johnson alleges he was the victim of racial discrimination when Claudy singled him out for a "re-interview" (Johnson Dep. 37), when ITT failed to give him the support necessary to deal with Tobyhanna Site Lead Mark Avery (*see* Compl. ¶¶ 37-42), when Claudy failed to redeploy him to Iraq (Compl. ¶ 79; Johnson Dep. 46), when Hughley failed to investigate his alleged claims of discrimination (*see* Johnson Dep. 71), and when Caucasian employees who he asserts also falsified their timecards—specifically Joseph Gray, Jeff Springer, and George Linker—were not terminated as he was (*see* Compl. ¶¶ 65, 66). Because these allegations are largely unsupported, the Court finds that, viewed either separately or collectively, they do not give rise to an inference that racial discrimination was at work here.

A plaintiff alleging employment discrimination can contest summary judgment by using either the direct or indirect method of proof. *Diaz v. Kraft Foods Global, Inc.*, No. 10-3073, 2011 WL 3437028, at *4 (7th Cir. Aug. 8, 2011); *Herron,* 388 F.3d at 299; *Cerutti v. BASF Corp.*, 349

---

[10]Johnson brings his racial discrimination claims under both Title VII and § 1981. In the Seventh Circuit, Title VII discrimination claims and § 1981 discrimination claims are essentially identical and are analyzed under the same rubric. *E.g.*, *Yancick*, 2011 WL 3319568, at *11; *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 940 (7th Cir. 1996). Along with his federal claims, Johnson also contends that he suffered racial discrimination under Indiana civil rights law. In construing Indiana civil rights law, Indiana courts often look to federal law for guidance. *Thornton v. St. Anne Home*, No. 1:09-CV-145, 2010 WL 2802350, at *5 (N.D. Ind. July 13, 2010); *Filter Specialists, Inc. v. Brooks,* 906 N.E.2d 835, 839 (Ind. 2009); *see, e.g.*, *Ind. Civil Rights Comm'n v. Culver Educ. Found.*, 535 N.E.2d 112, 115 (Ind. 1989). Accordingly, the Court adopts the same analysis for Johnson's Title VII, § 1981, and state law racial discrimination claims.

F.3d 1055, 1060 n.4 (7th Cir. 2003). The direct method requires the plaintiff to produce enough evidence, either direct or circumstantial, "that would permit a jury to infer that discrimination motivated an adverse employment action." *Diaz*, 2011 WL 3437028, at \*4; *see Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008) ("The focus of the direct method of proof . . . is not whether the evidence offered is 'direct' or 'circumstantial' but rather whether the evidence 'points directly' to a discriminatory reason for the employer's action."); *Cerutti*, 349 F.3d at 1061.

The indirect method is the well-known *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *Herron*, 388 F.3d at 299. Here, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In order to do so, the plaintiff must show that "(1) he is a member of a protected class; (2) he was performing well enough to meet his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees not in his protected class were treated more favorably." *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 599-600 (7th Cir. 2010); *see Herron*, 388 F.3d at 299. If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802; *see Naik*, 627 F.3d at 600; *Herron*, 388 F.3d at 299. Once the defendant has done so, the burden shifts back to the plaintiff to show that the proffered reason is merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804; *see Naik*, 627 F.3d at 600; *Herron*, 388 F.3d at 299.

### 1. Direct Method

Under the direct method, direct evidence is "something close to an explicit admission by the employer that a particular decision was motivated by discrimination; this type of evidence is rare, but it 'uniquely reveals' the employer's intent to discriminate." *Diaz*, 2011 WL 3437028, at

*4 (citations omitted). Besides presenting direct evidence, the plaintiff can also prevail by "constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker,'" *Cerutti*, 349 F.3d at 1061 (citations omitted). Case law delineates three categories of circumstantial evidence: "(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employee offered a pretextual reason for an adverse employment action." *Diaz*, 2011 WL 3437028, at *4. The plaintiff's own assertions, standing alone, are insufficient to establish a link between his race and his employer's treatment of him. *Winsley v. Cook Cnty.*, 563 F.3d 598, 605 (7th Cir. 2009); *King v. Schieferdecker*, No. 08-3213, 2011 WL 3273167, at *10 (C.D. Ill. Aug. 1, 2011); *see Karazanos v. Navistar Int'l. Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991) (stating that "a plaintiff's speculation is not a sufficient defense to a summary judgment motion").

Here, Johnson has cited to no evidence beyond his own belief that ITT discriminated against him because of his race. While he points to several incidents which he claims amount to racial discrimination—his "re-interview," lack of support from ITT, not being redeployed, the failure to investigate his claims, and his termination—these events are basically unsupported by the record and do not create a convincing mosaic suggesting an inference of racial discrimination. Moreover, under *Winsley* and *King*, Johnson's own assertions are insufficient to establish the necessary link between his race and ITT's employment decisions. Therefore, Johnson has fallen far short of meeting his burden under the direct method.

## 2. *Indirect Method*

Turning to the indirect method, Johnson makes several separate claims of racial discrimination by ITT in its employment decisions. Viewing these claims either separately or collectively, Johnson fails to establish a *prima facie* case of racial discrimination. As Johnson, the non-movant, "is unable to establish at least the minimal elements of the *prima facie* case under the *McDonnell Douglas* methodology, the entry of summary judgment is required." *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993).

As for the first prong, Johnson, as an African American, is clearly a member of a protected class. The other three prongs prove fatal to Johnson's claims.

To satisfy the second prong, Johnson must prove that his performance met ITT's legitimate expectations. *E.g.*, *Naik*, 627 F.3d at 600; *Herron*, 388 F.3d at 299. The Seventh Circuit Court of Appeals has found that employees who have falsified company documents did not meet their employers' legitimate expectations. *See Naik*, 627 F.3d at 600 (finding that plaintiff failed to meet employer's expectations when he falsified his call records); *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 546-47 (7th Cir. 2002) (affirming district court's finding that "it is abundantly clear that [p]laintiff failed to satisfy [d]efendant's legitimate expectations" where plaintiff, among other things, falsified company records after repeated warnings).

Under the third prong, Johnson must establish that he suffered an adverse employment action. *E.g.*, *Naik*, 627 F.3d at 600; *Herron*, 388 F.3d at 299. An adverse employment action is more than a mere inconvenience or an alteration of job responsibilities, *Cerros v. Steel Tech., Inc.*, 288 F.3d 1040, 1044 (7th Cir. 2002); it is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832,

838 (7th Cir. 2008) (internal citations omitted). Nevertheless, "not everything that makes an employee unhappy is an actionable adverse action." *Garcia v. U.S. Postal Serv.*, 414 F. App'x 855, 858 (7th Cir. 2011) (unpublished) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)). At a minimum, the plaintiff "must show quantitative or qualitative change in the terms or conditions of his employment that is more than a mere subjective preference." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).

Finally, under the indirect method, Johnson must show that similarly situated employees not in his protected class were treated more favorably. *E.g.*, *Naik*, 627 F.3d at 600; *Herron*, 388 F.3d at 299. To meet this burden, Johnson must establish that "there is someone who is directly comparable to [him] in all material respects." *Winsley*, 563 F.3d at 605 (citations omitted). While a plaintiff need not demonstrate "complete identity," "substantial similarity" given all relevant factors in the case is required. *Luster v. Ill. Dep't of Corr.*, No. 09-4066, 2011 WL 2857262, at *3 (7th Cir. July 19, 2011). These relevant factors include "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications." *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003) (citations omitted). Whether the comparator is a supervisor of the employee is also significant; "ordinarily, it will not be the case that a plaintiff is similarly situated to another employee when the plaintiff is subordinate to that employee." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 366 (7th Cir. 2009). At the same time, the Seventh Circuit has cautioned against a "hyper-technical approach to this prong," and looks for enough common features to allow a meaningful comparison between substantially similar employees. *Timm v. Ill. Dep't of Corr.*, 335 F. App'x 637, 642 (7th Cir. 2009) (unpublished). As such the Court has found that although a comparator was the plaintiff's

supervisor, because both were subject to the same institutional standards, disciplined by the same decisionmaker, and punished for the same transgression, involving identical conduct, they were similarly situated. *Id.*; *see Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 979 (7th Cir. 2006) (holding that employees' violation of the same work rule and placement in same violation category was sufficient for jury to find that all were similarly situated); *see also Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) (stating that the similarly-situated employee must have been disciplined, or not, by the same decisionmaker who imposed an adverse employment action on the plaintiff).

In the instant case, Johnson fails to establish all three remaining prongs. First, Johnson cannot show that he met ITT's legitimate performance expectations at the time of his termination. Like the plaintiffs in *Naik* and *Peters*, Johnson knowingly falsified company documents. Specifically, Johnson falsified his timecard, a violation of ITT policy, which resulted in overtime being charged to ITT's customer. (Hughley Dep. 121, 151, Ex. J; Claudy 96.) Furthermore, this was a knowing violation; Johnson not only admitted that he sometimes did not record his time accurately, but that he knew charging overtime he had not worked was wrong. (Johnson Dep. 135, 30.) By falsely recording his time, Johnson failed to meet ITT's legitimate expectations.

As for the third prong, Johnson presents several possible adverse employment actions: (1) he was the only team member "re-interviewed" after their return from Iraq; (2) he was not given support to deal with Avery at Fort Campbell; (3) he was not redeployed to Iraq; (4) ITT failed to launch an investigation into his complaint; and (5) he was terminated. Considering that an adverse employment action is a significant change in employment status, such as firing or reassignment with significantly different responsibilities, *Chaudhry*, 546 F.3d at 838, and after examining the

14

facts in the record, the only claim that qualifies as an adverse employment action is Johnson's termination.

The supposed "re-interview" after Johnson returned from Iraq was brief, informal, and did not include anyone from Human Resources. (Claudy Dep. 32, 34.) Johnson's meeting with Claudy occurred after the contract under which he was working expired—and therefore his previous position no longer existed—and its purpose was to determine if Johnson wanted to stay with ITT and to inform him of the open positions. (Claudy Dep. 32.) Johnson even admitted that he was happy about being placed in the field service representative role. (Johnson Dep. 40.) Since the purpose of this meeting was to assign Johnson to a new position after the previous contract had expired, thereby preventing a layoff, it does not qualify as an adverse employment action.

As for Johnson's claim of lack of support to deal with Avery, Avery was simply a source of difficulty and unhappiness for Johnson, and "not everything that makes an employee unhappy is an actionable adverse action." *Garcia*, 414 F. App'x at 858. Furthermore, not only was this not an adverse employment action, on par with a firing or failure to promote, but ITT *did* send Johnson support to deal with Avery in the form of Dave Rees, who temporarily improved Avery's behavior. (Johnson Dep. 165.) Because Avery was a Tobyhanna employee, ITT could do only so much.

Additionally, the fact that Johnson was not redeployed to Iraq does not qualify as an adverse employment action because, although Johnson expressed an interest in an open installer position in Iraq, that position never materialized. (Claudy Dep. 58.) There can be no adverse employment action when the position did not exist. While a prior installer position had been filled previously, Johnson did not know about it until after it was occupied.

15

Lastly, ITT's failure to investigate the email that serves as Johnson's so-called "complaint" does not amount to an adverse employment action because it was not a "quantitative or qualitative change in the terms or conditions of his employment." *Johnson*, 325 F.3d at 901. Johnson's email, which was triggered by his absence on June 6th, was devoid of any complaint of harassment, discrimination, or retaliation (Johnson Dep. 71-73, Ex. 24), and, as such, no company action was required. Therefore, Johnson's termination remains as the only adverse employment action; however, because Johnson cannot satisfy the second and fourth prongs of the indirect analysis, this claim also fails.

For all of his claims, Johnson is unable to point to similarly situated members outside of his protected class that were treated more favorably then he was. Several of his claims can be easily discounted. First, Johnson's claim that his Caucasian team members were not "re-interviewed" is factually incorrect based on the record before the Court. According to Claudy, every member of Johnson's Iraq team met with Claudy, regardless of their race. (Claudy Dep. 32.) Similarly, Johnson cannot show that other similarly situated employees outside of his protected class were given more support than he was provided in dealing with Avery. Johnson recognized that everyone, regardless of race, had issues with Avery and could not identify "any individuals who were in the same position . . . who requested and received assistance that [he] didn't receive." (Johnson Dep. 88:17-20.) Once again, those outside of Johnson's protected class were treated just as he was in regards to Avery. As for being redeployed to Iraq, while Johnson initially alleged that Claudy deployed everyone on Johnson's previous team except him, he later admitted that Blackwood and Wohlfort were his superiors and that he was "not even sure" when Pilapil, Kneeland, or Landum returned to Iraq. (Johnson Dep. 46-47.) Alternatively, if Johnson is arguing that he should have been assigned to the first open installer position in Iraq instead of Dave Rees,

this argument also fails because Rees was Johnson's superior and, as such, without something more, he does not qualify as a comparator. *See Patterson*, 589 F.3d at 366. Johnson's remaining possible comparators require more analysis.

The comparator most similar to Johnson is Jorge Medina. Medina, a Hispanic ITT Communication employee, was employed at the same base as Johnson, in the same position, and was terminated for violating the same policy for the same exact misconduct as Johnson. (Claudy Dep. 76, Exs. 5, 6, and 7.) This certainly seems like a "substantial similarity," *see Luster* 2011 WL 2857262, at *3, if not almost identical. The one complication concerns Medina and Johnson's hierarchal relationship. While Johnson maintains that Medina was his supervisor (Johnson Dep. 56), ITT characterizes Medina as Johnson's mentor, whom he was shadowing (Claudy Dep. 73). Even if Medina is considered Johnson's supervisor, Medina is still a similarly situated employee outside of Johnson's protected class because Johnson and Medina were subject to the same institutional standards, were disciplined by the same decisionmaker—Chuck Hughley—and were punished for identical conduct—falisfying timecards. *See Timm*, 335 F. App'x at 642; *Davis*, 445 F.3d at 979. As such, they are similarly situated for the purposes of the indirect method. Because Medina was a similarly situated employee outside of Johnson's protected class and was treated exactly the same as Johnson for the same transgression, Johnson cannot fulfill the fourth prong using Medina as a comparator.

Nevertheless, Johnson also alleges that Jeff Springer, George Linker, and Joseph Gray are similarly situated comparators. Even when viewed most favorably to Johnson, the facts only support Johnson's allegations against Gray. Johnson's belief that Jeff Springer falsified his timecard is based only upon statements he heard from other employees. (Johnson Dep. 89-90.) Moreover, Springer is apparently an ITT Systems employee and, therefore, reports to a different

manager than Claudy.[11]  (*See* Johnson Dep. 89-90.)  As such, even if Springer had been caught

falsifying his timecard, Springer cannot be similarly situated to Johnson because he would have

been subject to discipline by a different decisionmaker.  *See Little*, 369 F.3d at 1012.  Johnson

further believes that George Linker falsified his timecard while he was at a different site at Fort

Campbell.  (Johnson Dep. 92-93.)  Once again, Johnson's only evidence of this are some "second

hand" things Johnson heard.  (Johnson Dep. 93.)

      Regarding Gray, Gray is not similarly situated to Johnson because he did not engage in the

same misconduct.  While Johnson submitted actual false timecards to ITT charging overtime, Gray

never submitted false timecards and never charged overtime, but rather was instructed by the

customer to write down false time on the sign-in sheet.  (Claudy Dep. 95, 98.)  Moreover, Gray

admitted to the discrepancy and was apologetic and forthcoming, while Johnson still maintains

that he did not falsify his timecard.  (Beeson Aff. ¶ 15; Johnson Dep. 132.)  Most fatal to

Johnson's claim is the fact that Gray and Johnson were disciplined by different decisionmakers;

Hughley disciplined Johnson, but Beeson disciplined Gray.  (Hughley Dep. 151; Beeson Aff. ¶

15.)  Therefore, Gray was not similarly situated to Johnson, *see Timm*, 335 F. App'x at 642; *Davis*,

445 F.3d at 979, precluding Johnson from satisfying the fourth prong of the indirect method

analysis.

      As Johnson has failed to establish a *prima facie* case of racial discrimination under the

indirect method, the Court finds it unnecessary to undertake any analysis of pretext.  *Plair v. E.J.*

*Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997) (noting that pretext analysis is necessary

only if a plaintiff has already established a *prima facie* case and that the *prima facie* case is the

---

[11]Based on the truncated verison of Johnson's deposition, it appears that Jeff Springer was an employee of ITT Systems.  However, this is not directly stated in the pages of the deposition presented to the Court.

"condition precedent" to pretext analysis); *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 798 (7th Cir. 1995) (finding that plaintiff's failure to establish a *prima facie* case makes it unnecessary for Court to discuss pretext); *see Jones v. Union Pac. R.R Co.*, 302 F.3d 735, 741 (7th Cir. 2002) (stating that the Seventh Circuit has often noted that establishing a *prima facie* case is a condition precedent to the pretext analysis).  Accordingly, the Court will GRANT ITT's Motion for Summary Judgment as to Johnson's racial discrimination claims under Title VII, § 1981, and Indiana's civil rights law.

### B.  Racial Harassment

Along with discrimination, Johnson claims that he was racially harassed.  For Johnson's racial harassment claim to survive summary judgment, the record must "contain sufficient evidence to create a material issue of fact as to four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) race must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability."  *Yancick*, 2011 WL 3319568, at *11.  Johnson's allegations of racial harassment are unsupported by the record, and, as such, he fails to meet his burden of establishing a *prima facie* case.

Even if Johnson's workplace was offensive—a component almost totally missing on this record—he wholly fails to meet the second and third prongs of the harassment test.  The record contains nothing indicating that any alleged harassment was based upon Johnson's race.  Although the plaintiff need not show that the complained-of conduct was explicitly racial, the plaintiff "must show it had a racial character or purpose."  *Id.* at *12.  While Johnson testified that Claudy was "little loud spoken"and "talking louder than usual" after receiving a customer complaint about Johnson's absence on June 6th (Johnson Dep. 164:4-8) and that Claudy treated him "a little harsh"

after Johnson sent his June 12th email, Johnson never made any complaints of racial harassment to Claudy or about Claudy (Claudy Dep. 91-93; Hughley Dep. 147-48). No evidence in the record suggests that Claudy's frustration with Johnson after Johnson's June 6th absence had a racial purpose or character; rather Claudy was angry because he received a customer complaint. (Claudy Dep. 67.) Additionally, Johnson's June 12th email mentioned nothing about harassment, discrimination, or retaliation by ITT because of his race. (Johnson Dep. 71, Ex. 24.) Although Johnson briefly mentions that Claudy introduced himself to Johnson and his team members as a "prick" (Johnson Dep. 115-16), even if this introduction could be construed as harassment, Claudy said it to a group of racially diverse employees; there is no evidence that it was directed solely at Johnson because of his race.

As regards the third prong, any alleged harassment falls well below "severe and pervasive." Seventh Circuit courts have held that the an actionable workplace is one that is "hellish," *Whitaker v. N. Ill. Univ.*, 424 F.3d 640, 645-646 (7th Cir. 2005); *McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 614 (7th Cir. 2004), and "one that a reasonable person would find hostile or abusive," *Yancick*, 2011 WL 3319568, at *12 (citations omitted). Even if Johnson's allegations about Claudy's tone and demeanor toward him were true, a reasonable person would not find it to be hostile or abusive. Accordingly, Johnson cannot establish a *prima facie* case of racial harassment, and the Court will GRANT ITT's Motion for Summary Judgment on Johnson's racial harassment claim.

### C. Retaliation

Johnson also alleges that ITT retaliated against him following his June 12, 2009, email. Under Title VII, "unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *Rogers v. City of*

*Chicago.*, 320 F.3d 748, 753 (7th Cir. 2003).  As with his discrimination claims, Johnson may

prove his retaliation claim by using either the direct or indirect method.  *Benuzzi v. Bd. of Educ. of*

*Chicago*, No. 10-3021, 2011 WL 2909904, at *12 (7th Cir. July 21, 2011).

### 1. Direct Method

Under the direct method, to avoid summary judgment on a retaliation claim, the plaintiff

must produce evidence from which a jury could conclude: "(1) that [he] engaged in a statutorily

protected activity; (2) that [he] suffered a materially adverse action by [his] employer; and (3)

there was a causal link between the two."  *Id.* (internal citations omitted).  Like discrimination

claims, there are two types of permissible evidence: (1) direct evidence, meaning evidence that, if

believed by the trier of fact, would prove the fact in question without relying on inference or

presumption; and (2) circumstantial evidence, defined as evidence that allows a jury to infer

intentional discrimination by the decisionmaker.  *Rogers*, 320 F.3d at 753.

To constitute statutorily protected activity under Title VII, an official complaint with an

employer "must indicate that discrimination occurred because of sex, race, national origin, or some

other protected class."  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006); *see*

*Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) ("Although an employee need not

use the magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's

retaliation protections, 'she has to at least say something to indicate her [gender] is an issue.'")

(citations omitted).  Even if an employee honestly believes that he is the object of discrimination,

if he never mentions it, "a claim of retaliation is not implicated, for an employer cannot retaliate

when it is unaware of any complaints."  *Sitar*, 344 F.3d at 727 (quoting *Miller v. Am. Family Mut.*

*Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000)).  Therefore, when a complaint fails to raise some

claim of discrimination, harassment, or retaliation based on a protected class, the Seventh Circuit

has held that the plaintiff did not engage in statutorily protected activity. *See Tomanovich*, 457 F.3d at 664 (holding that plaintiff's grievances that failed to point to any evidence indicating the alleged harassment was based upon his sex or was sexual harassment did not constitute statutorily protected activity); *Sitar*, 344 F.3d at 727-28 (finding that plaintiff's claim of a retaliatory transfer was doomed upon her concession that she never told her employer that sex discrimination was her real problem); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1146-47 (7th Cir. 1997) (holding that plaintiff did not engage in protected activity because she never reported her allegations of sexual harassment during her employment with defendant).

The second prong requires that the plaintiff suffered a materially adverse action by his employer as a consequence of his protected behavior. *Benuzzi*, 2011 WL 2909904, at *12. The Seventh Circuit defines "materially adverse actions" as "those that might dissuade a reasonable employee from engaging in protected activity." *Id.* This category is more expansive than the "adverse employment actions" required to sustain a discrimination claim. *Id.* Suspensions, terminations, or demotions qualify as materially adverse actions, while empty threats the employee is unaware of and written warnings alone do not constitute materially adverse actions. *See id.*

Once the first and second prongs have been established, the third prong—requiring a causal link between the protected activity and the materially adverse action—presents the biggest hurdle to retaliation plaintiffs. *Id.* at *13. Seventh Circuit courts often look to the proximity between the complaint and the adverse action to determine if the causality element is met. *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) ("The closer two events are, the more likely the first caused the second."). If the adverse employee action is extremely close in time to the complaint— within a few days—an inference of causality may be reasonable. *Compare Loudermilk*, 636 F.3d at 315 (inference of causality reasonable where employee discharged immediately after handing

his supervisor a note detailing allegations of discrimination), *and McClendon v. Ind. Sugars, Inc.,* 108 F.3d 789, 797 (7th Cir. 1997) (inference of causality reasonable when two to three days separated employee's protected statement and termination), *with Benuzzi*, 2011 WL 2909904, at *13 (finding that the two-months separating the plaintiff's EEOC complaint and her suspension were insufficient to give rise to an inference of causality), *and Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (holding that a seven-week interval between plaintiff's sexual harassment complaint and her termination did not give rise to an inference of causality).

Here, Johnson fails on both the first and third prongs of the direct analysis. First, Johnson did not engage in a statutorily protected activity because he never informed ITT of his complaints of racial discrimination, harassment, or retaliation during his employment. His June 12, 2009, email—which Johnson testified included all of his complaints—does not identify any claims of discrimination, harassment, or retaliation because of race. (*See* Johnson Dep. 71-73, Ex. 24.) Even if Johnson sincerely believed he was being racially discriminated against, he never mentioned his claims of racial discrimination to ITT and, thus, a claim of retaliation is not implicated because ITT could not retaliate when it was unaware of Johnson's racial harassment complaints. *Sitar*, 344 F.3d at 727. Therefore, as Johnson's complaint fails to raise some claim of discrimination, harassment, or retaliation based on his race, Johnson did not engage in statutorily protected activity. *See Tomanovich*, 457 F.3d at 664; *Sitar*, 344 F.3d at 727-28.

As for the second prong, Johnson alleges retaliation because: (1) he was not redeployed to Iraq; (2) his purported complaint was not given more attention; and (3) he was terminated for falsifying his timecard. Among these claims, only Johnson's termination qualifies as a "materially adverse action," fulfilling the second prong. *Benuzzi*, 2011 WL 2909904, at *12.

Despite satisfying the second prong, Johnson cannot establish a causal link between his June 12, 2009, emailed "complaint" and his firing on August 11, 2009. This is a gap of approximately two months, which, standing alone, is insufficient to give rise to an inference of causality. *Benuzzi*, 2011 WL 2909904, at *13. As Johnson provides no other evidence of causality, he cannot establish a *prima facie* case of retaliation under the direct method.

### 2. *Indirect Method*

To establish a *prima facie* case of retaliation under the indirect method, the plaintiff must demonstrate four elements: (1) that he engaged in a statutorily protected activity; (2) that he suffered an adverse employment action; (3) that he met his employer's legitimate expectations; and (4) that he was treated less favorably than similarly situated employees who did not engage in the statutorily protected activity. *Silverman v. Bd. of Educ. of Chicago*, 637 F.3d 729, 742 (7th Cir. 2011). If the plaintiff establishes these elements, the burden shifts to the employer to produce a legitimate, non-retaliatory reason for the adverse employment action. *Id.*

The Court has dealt with the first and second prongs in the direct method analysis. Once again, while Johnson presumably suffered an adverse employment action—his termination—he did not engage in a statutorily protected activity. Similarly, as analyzed under Johnson's racial discrimination claims, the Court already found that Johnson failed to meet his employer's legitimate expectations because he was falsifying his timecard. As for the last prong, nowhere in the record does Johnson even attempt to show that there was a similarly situated employee who did engage in statutorily protected activity and was treated more favorably then him. As such, Johnson has failed to establish a *prima facie* case of retaliation under either the direct or indirect method, and pretext analysis is once again unnecessary. *Plair*, 105 F.3d at 374; *DeLuca*, 53 F.3d

at 798; *see Jones*, 302 F.3d at 741.  Therefore, the Court will GRANT ITT's Motion for Summary Judgment on Johnson's retaliation claim.

### D.  *Intentional Infliction of Emotional Distress*

Finally, Johnson contends that ITT intentionally inflicted emotional distress on him.  Under Indiana law, to make out an intentional infliction of emotional distress claim, the plaintiff must show that the defendant intentionally or recklessly caused him severe emotional distress by extreme and outrageous conduct.  *Morgan v. Snider High Sch.*, No. 1:06-cv-337, 2007 WL 3124524, at *13 (N.D. Ind. 2007) (citing *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991)).  The standard is a rigorous one, and Indiana courts require some showing by the plaintiff that the alleged conduct "exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind."  *Id.* (quoting *Seiwert v. Spencer-Own Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 957 (S.D. Ind. 2007)).  The alleged conduct must be regarded as "atrocious and utterly intolerable in a civilized community"; accordingly, mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not impose liability.  *Ott v. Edinburgh Cmty. Sch. Corp.*, No. 1:30-CV-1413, 2005 WL 2886212, at *6 (S.D. Ind. Oct. 31, 2005).

Here, Johnson has failed to identify any conduct in the record that even comes close to the outrageousness or indecency required to make out an intentional infliction of emotional distress claim.  All Johnson alleges relevant to this claim is that Claudy called him "in an upset manner" when he did not show up for work on June 6, 2009, and that, after Johnson's June 12th email, Claudy was a "little harsh" to him, like Claudy was targeting him.  (Johnson Dep. 113.)  If anything, these allegations are mere annoyances or trivialities; they do not exceed all bounds usually tolerated by a decent society.  *See Morgan,* 2007 WL 3124524, at *13.  Furthermore, Johnson has also failed to offer evidence that would support even a reasonable inference that ITT

or its employees intended to inflict emotional distress on him. *Id.* (granting summary judgment when the plaintiff failed to present evidence to support a reasonable inference that any of the defendants intended to inflict emotional distress on the plaintiff). Consequently, the Court will GRANT ITT's Motion for Summary Judgment on Johnson's intentional infliction of emotional distress claim.

### *E. Conclusion*

For the reasons set forth above, the Court GRANTS Defendant ITT's Motion for Summary Judgment (Docket # 20) and DIRECTS the Clerk to enter judgment in favor of ITT and against Plaintiff Johnson.

SO ORDERED.

Entered this 1st day of September, 2011.

/s/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge
